**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 22-1491**

───────────────

UNITED STATES OF AMERICA,

Plaintiff − Appellant,

and

COMMONWEALTH OF VIRGINIA,

Plaintiff,

v.

WALGREEN CO.,

Defendant – Appellee.

-------------------------------

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; THE AMERICAN MEDICAL ASSOCIATION; THE MEDICAL SOCIETY OF VIRGINIA; NATIONAL ASSOCIATION OF CHAIN DRUG STORES, INCORPORATED; NATIONAL HEALTH LAW PROGRAM,

Amici Supporting Appellee.

───────────────

**No. 22-4292**

───────────────

COMMONWEALTH OF VIRGINIA,

Plaintiff − Appellant,

and

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

WALGREEN CO.,

        Defendant – Appellee.

-------------------------------

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; THE AMERICAN MEDICAL ASSOCIATION; THE MEDICAL SOCIETY OF VIRGINIA; NATIONAL ASSOCIATION OF CHAIN DRUG STORES, INCORPORATED; NATIONAL HEALTH LAW PROGRAM,

        Amici Supporting Appellee.

Appeal from the United States District Court for the Western District of Virginia, at Abingdon.  James P. Jones, Senior District Judge.  (1:21−cv−00032−JPJ−PMS)

Argued:  May 4, 2023                          Decided:  August 15, 2023

Before DIAZ, Chief Judge, and WYNN and QUATTLEBAUM, Circuit Judges.

Vacated and remanded by published opinion.  Chief Judge Diaz wrote the opinion, in which Judge Wynn and Judge Quattlebaum joined.

**ARGUED:**  Martin V. Totaro, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Martin Jordan Minot, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellants.  Jonathan M. Phillips, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellee.  **ON BRIEF:**  Brian M. Boynton, Principal Deputy Assistant Attorney General, Michael S. Raab, Charles W. Scarborough, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Christopher R. Kavanaugh, United States Attorney, OFFICE OF THE UNITED STATES

ATTORNEY, Roanoke, Virginia, for Appellant United States of America. Jason S. Miyares, Attorney General, Charles H. Slemp III, Chief Deputy Attorney General, W. Clay Garrett, Assistant Attorney General, Andrew N. Ferguson, Solicitor General, Erika L. Maley, Principal Deputy Solicitor General, Lucas W.E. Croslow, Deputy Solicitor General, Rohiniyurie Tashima, John Marshall Fellow, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellant Commonwealth of Virginia. Reed Brodsky, New York, New York, Matt Gregory, Francesca Broggini, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellee. Tara S. Morrissey, Andrew R. Vance, UNITED STATES CHAMBER LITIGATION CENTER, Washington, D.C., for Amicus Chamber of Commerce of the United States of America. Elisabeth S. Theodore, Kolya D. Glick, ARNOLD PORTER KAYE SCHOLER LLP, Washington, D.C., for Amici Chamber of Commerce of the United States of America, The American Medical Association, and The Medical Society of Virginia. Scott McIntosh, Kirti V. Reddy, QUARLES & BRADY LLP, Washington, D.C., for Amicus National Association of Chain Drug Stores. Martha Jane Perkins, Arielle Linsey, Catherine McKee, NATIONAL HEALTH LAW PROGRAM, Chapel Hill, North Carolina, for Amicus National Health Law Program.

———————

DIAZ, Chief Judge:

The United States and the Commonwealth of Virginia (together, the "governments") appeal the district court's dismissal of their complaint under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and Virginia state law. The governments allege that Walgreen Co. ("Walgreens") misrepresented that certain patients met Virginia's Medicaid-eligibility requirements for expensive Hepatitis C drugs.

The district court dismissed the complaint, holding that Virginia's eligibility requirements violated the Medicaid Act, and therefore Walgreens's misrepresentations were immaterial as a matter of law. We hold that the governments plausibly allege facts that establish materiality. So we vacate and remand.

## I.

## A.

The governments' complaint alleges the following.

### 1.

Virginia participates in Medicaid and administers its state plan through its Department of Medical Assistance Services. The Department, in turn, contracts with Magellan Medicaid Administration and two managed-care organizations (Virginia Premier and Aetna) to administer patients' Medicaid claims and cover prescription drugs.

4

The Department covers Sovaldi, Harvoni, and Daklinza, which are direct-acting antiviral drugs that treat Hepatitis C.[1]  These drugs are "extremely expensive."  J.A. 17 ¶ 40.  To control costs, the Department requires prior authorization before patients may obtain the drugs.  *See* 42 U.S.C. § 1396r-8(d)(1)(A) ("A State may subject to prior authorization any covered outpatient drug.").

During the relevant time, the Department had built into its prior-authorization process two eligibility requirements that are at issue here.  First, a patient's Hepatitis C had to be sufficiently severe; this generally required a fibrosis score of at least 0.59, a metavir stage of at least F3, or documented cirrhosis of the liver.[2]  Second, a patient must have abstained from alcohol and illicit substances for six months, as shown by an acceptable drug- and alcohol-screening test.

The Department tasked Magellan, Virginia Premier, and Aetna with ensuring that Medicaid patients seeking coverage for direct-acting antiviral drugs met Virginia's eligibility requirements.  If they determined that the patient satisfied the criteria (including the disease-severity and substance-abstinence requirements), the patient would receive Medicaid coverage for the requested drugs and pharmacies like Walgreens would be reimbursed by Medicaid for dispensing them.  Conversely, a patient deemed ineligible would be denied coverage and told why.

---

[1] Hepatitis C is an infection caused by the hepatitis C virus that primarily affects the liver.

[2] The fibrosis and metavir scoring systems are used to assess fibrosis, or scarring of the liver, in patients with Hepatitis C.

2.

Enter Amber Reilly, a clinical pharmacy manager for a Walgreens store in Kingsport, Tennessee. Reilly told her store manager she had become "an expert in customizing [Medicaid-coverage] appeal letters" to "receiv[e] approvals [for direct-acting antiviral drugs], which in turn . . . increased profits and strengthened relationships with providers." J.A. 20 ¶ 56.

But rather than "customizing" Medicaid paperwork, Reilly was *falsifying* patient records and other documents to satisfy Virginia's eligibility requirements.

The governments' complaint illustrates the fraudulent scheme with twelve Virginia Medicaid patients, Patients 1 through 12. For instance, Virginia Premier at first denied Patient 3's prior-authorization request for direct-acting antiviral drugs because it wasn't backed up by "negative urine drug screens." J.A. 29 ¶ 107. In response, Reilly's Walgreens store submitted reports that falsely showed Patient 3 passed the drug test. After that, the Department approved the request, costing Virginia Medicaid over $64,000.

Similarly, Patient 8 was denied prior authorization for the drugs, and on appeal to the Department, acknowledged falling short of Virginia's metavir-score threshold. The Department upheld the denial. Then Reilly's Walgreens store got involved, submitting a false lab report that changed Patient 8's fibrosis score from 0.19 to 0.59 and metavir level from F0 to F3, after which the Department approved coverage and paid Walgreens over $96,000.

6

This fraudulent scheme took place from at least January 2015 through June 2016. During that time, Reilly's Walgreens store's revenue increased more than 320% over the year before.

Walgreens learned about the fraudulent scheme at least as early as 2016, when Tennessee and Walgreens both launched investigations. Reilly has since pleaded guilty to engaging in the same scheme to defraud Tennessee's Medicaid program. But Walgreens still hasn't paid back any of the money it received for Virginia Medicaid Patients 1 through 12.

B.

The governments sued Walgreens, alleging (1) violations of the federal False Claims Act and Virginia's state-law version; and (2) state-law claims of fraud, unjust enrichment, and payment by mistake.

Walgreens moved to dismiss and asked the district court to take judicial notice of various documents. One was the Centers for Medicare and Medicaid Services' Release No. 172 from November 2015, entitled *Assuring Medicaid Beneficiaries Access to Hepatitis C (HCV) Drugs*.

In that Release, the Centers expressed "concern[] that some states are restricting access to [direct-acting antiviral] drugs contrary to the [Medicaid Act] by imposing conditions for coverage that may unreasonably restrict access to these drugs," including by requiring a "metavir fibrosis score F3" or higher, or by "requiring a period of abstinence from drug and alcohol abuse as a condition for payment" for the medications. J.A. 97–98. The Centers noted that any restrictions on coverage must satisfy the Medicaid Act and

7

"should not result in the denial of access to effective, clinically appropriate, and medically necessary treatments" using these medications.  J.A. 98.

The district court held a hearing.  Walgreens argued that Reilly's store's misrepresentations couldn't be material because they went to eligibility requirements that violated the Medicaid Act, so the drugs should've been covered no matter if patients had a sufficient fibrosis score, abstained from drugs, and so on.

The district court agreed with Walgreens's materiality argument.  The court held that Virginia's eligibility requirements violated the Medicaid Act because they restricted coverage of medically necessary drugs beyond the permissible restrictions laid out in 42 U.S.C. § 1396r-8(d)(1)(B).

As for materiality, the district court reasoned:

> On a superficial level, the fraudulent statements and records did influence the decision of [the Department] and its contractors to approve reimbursement for the relevant drugs.  But the falsified records *should not have* so influenced the decision-making because the drugs should have been covered for Patients 1 through 12 regardless of the information contained on the falsified records.  The relevant drugs should have been covered because they were properly prescribed medically necessary treatments for which there was not an equally effective covered alternative.  The plaintiffs have not alleged that the drugs were not medically necessary for Patients 1 through 12 or that there were equally effective alternative medications that would have been covered.

*United States v. Walgreen Co.*, No. 1:21CV00032, 2021 WL 5760307, at *11 (W.D. Va. Dec. 3, 2021).  So while the district court found the fraud to be "regrettable, to say the least," it determined that "Walgreens was entitled to be reimbursed by Virginia Medicaid under the federal statute governing Medicaid funds." *Id.* at *12.  This foreclosed the

governments from pleading the necessary element of materiality under the False Claims Act and doomed their state-law claims as well, the court held.

The governments appealed.[3]

## II.

We review de novo the district court's dismissal under Federal Rule of Civil Procedure 12(b)(6). *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022). We view factual allegations in the light most favorable to the governments, without crediting "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *Id.* (cleaned up). To avoid dismissal, the complaint must state a claim to relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).[4]

## III.

To plausibly allege a claim under the False Claims Act, a plaintiff must generally plead four elements: "(1) there was a false statement or fraudulent course of conduct; (2)

---

[3] The governments also appealed the district court's denial of their request for reconsideration under Federal Rule of Civil Procedure 59. But we need not reach that issue because we vacate the dismissal.

[4] While not at issue, the governments' fraud claims must also satisfy Rule 9(b)'s heightened pleading standards. *Taylor*, 39 F.4th at 189. A defendant's mindset can be alleged generally, but plaintiffs must particularly allege the "who, what, when, where, and how of the alleged fraud." *Id.* (cleaned up).

made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due." *Taylor*, 39 F.4th at 188 (cleaned up).

We hold that the governments' complaint plausibly alleges facts that establish False Claims Act materiality as explained in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016). So we vacate the dismissal and remand for further proceedings.

The district court and the parties took on the daunting question whether Virginia's eligibility requirements violated the Medicaid Act. But we don't think it necessary to answer that question (at least at this point in the proceedings) because it doesn't control materiality as a matter of law.

The governments allege that the misrepresentations did, in fact, influence the decisionmakers. As we explain below, that's what matters under *Escobar*. And in any event, we're persuaded by the governments' argument that Walgreens can't collaterally attack Virginia's eligibility requirements as a defense to fraud.

### A.

We begin by summarizing the authorities that bear on this case.

According to the False Claims Act's text, "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

*Escobar* is the key case on materiality, which the Court called a "rigorous" requirement. 579 U.S. at 181. Materiality "looks to the effect on the likely or actual

10

behavior of the recipient of the alleged misrepresentation." *Id.* at 193 (cleaned up). So whether a requirement is an express condition of payment might be "relevant, but [it's] not automatically dispositive" of materiality. *Id.* at 194. The Court went on:

> Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular . . . requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material.

*Id.* at 194–95.

Following *Escobar*'s lead, we've analyzed materiality at the pleading stage. In *Taylor*, we upheld the dismissal of a False Claims Act claim when the relator failed to allege how or whether a misrepresentation about corporate certificates of authorization impacted government decision-making on claims for payment. 39 F.4th at 191, 202.

The relator alleged only that the government generally rejected claims by individual healthcare providers who had lost their personal medical licenses. *Id.* at 191. But medical licenses are distinct from corporate certificates of authorization, and the relator didn't plausibly allege how the government would treat a claim by a company that truthfully represented it lacked such a certificate. *Id.* at 193–94. Even if a certificate were an express condition of payment, that's not enough under *Escobar*. *Id.* at 190. Rather, the relator had to allege how the misrepresentations at issue would influence government decision-making in practice. *Id.* at 194–95.

11

B.

We hold that the governments' complaint sufficiently alleges materiality under *Escobar* and *Taylor*. As alleged, the Department and its proxy decisionmakers rejected (or required more information about) claims when patients truthfully stated they didn't satisfy Virginia's disease-severity or substance-abstinence requirements. The decisionmakers changed course and approved these same patients' claims only after Walgreens doctored documents and lied to indicate compliance with those requirements.

Taking these allegations as true, they show that Walgreens's misrepresentations had "a natural tendency to influence, or [were] capable of influencing," the government decisionmakers. 31 U.S.C. § 3729(b)(4). In fact, they *did* influence the decisionmakers. According to *Escobar* and *Taylor*, that's what materiality under the False Claims Act is all about.

The district court erred when it held that it wasn't enough for the governments to plead that "the fraudulent statements and records did influence the decision of [the Department] and its contractors to approve reimbursement for the relevant drugs." *Walgreen*, 2021 WL 5760307, at *11. The court suggested that the governments also needed to allege that the falsified representations "*should . . . have* so influenced the decision-making." *Id.* But that's more than the statutory text, *Escobar*, and *Taylor* require.

The legality of Virginia's eligibility requirements might be relevant to whether the misrepresentations had a natural tendency to influence, or could influence, the decisionmakers. But it isn't dispositive, the same way that labeling something an express condition of payment "is relevant to but not dispositive of" materiality. *Escobar*, 579 U.S.

12

at 190.[5]    And the complaint plausibly (in a non-conclusory way) alleges that the misrepresentations did, in fact, influence the decisionmakers.

As *Escobar* explains, the Act's "focus remains on those who present or directly induce the submission of false or fraudulent claims" to the government. *Id.* at 182.  There's no dispute that Reilly's Walgreens store fraudulently submitted false claims.  Allowing Walgreens to avoid liability by challenging Virginia's eligibility criteria only after getting caught would hinder the Act's purpose of holding fraudsters accountable.

Indeed, the very act of falsifying records to feign compliance with requirements suggests that Walgreens itself thought that those requirements were material.  *See United States ex rel. Badr v. Triple Canopy, Inc.*, 775 F.3d 628, 638 (4th Cir. 2015) ("Triple Canopy's actions in covering up the guards' failure to satisfy the marksmanship requirement suggests its materiality.  If Triple Canopy believed that the marksmanship requirement was immaterial to the Government's decision to pay, it was unlikely to orchestrate a scheme to falsify records on multiple occasions.").

---

[5] The guidance from the Centers for Medicare and Medicaid Services that the district court found to be a "compelling interpretation of the applicable statute," *Walgreen*, 2021 WL 5760307, at *10, was published eleven months after the fraudulent scheme had begun. So we question the district court's conclusion that the decisionmakers should've paid out the claims no matter if patients met Virginia's eligibility requirements at a time when they didn't have the benefit of this guidance.  The district court didn't engage with this fact and Walgreens hasn't either.  We leave open whether a misrepresentation can be material when it goes to a requirement that's so blatantly illegal that no reasonable decisionmaker could be influenced by it.  That's not the case here, where the legality of Virginia's requirements was fairly debatable—both before and after Release 172.

*Triple Canopy* was decided shortly before *Escobar*, which vacated our decision and remanded for further consideration. 579 U.S. 924 (2016). But we've continued to cite the vacated opinion's persuasive reasoning.

For instance, in *Taylor*, we cited *Triple Canopy* for the proposition that the government's early intervention in the qui tam action was an indicator of materiality. 39 F.4th at 194. So too here: If the government's early intervention signals materiality, then the fact that the governments here were the original plaintiffs to bring this False Claims Act suit should be an even stronger indicator of materiality.

C.

Vacating the dismissal is necessary for other reasons, too.

1.

The complaint alleges at least one misrepresentation unrelated to the eligibility requirements Walgreens challenges. When Walgreens steered Patient 12's request through the prior-authorization process for the drugs at issue, Virginia asked whether Patient 12 might instead be able to use "the preferred alternative, Viekira Pak." J.A. 49 ¶ 254.[6] In response, the Walgreens store falsely represented that Patient 12 couldn't use Viekira Pak

---

[6] Amici supporting Walgreens explain that this is typical of the way prior authorization is intended to operate. *See, e.g.*, Brief of the National Association of Chain Drug Stores as Amicus Curiae in Support of Defendant-Appellee at 8 ("To comply with this [statutory] regime, a provider wishing to prescribe a medication requiring prior authorization will typically call a government hotline, at which point the government and a provider can discuss whether there is a cost-effective, therapeutically comparable drug to the one the provider wishes to prescribe. The government may persuade the provider to prescribe another drug, or it may not; coverage is assured so long as the provider takes the administrative step of calling the state." (cleaned up)).

because of an adverse reaction to a related drug. After Walgreens made that representation, Virginia approved Patient 12's request for direct-acting antiviral drug coverage, for which it paid over $98,500.

In other words, this alleged misrepresentation (that Patient 12 couldn't use the cheaper drug alternative) has nothing to do with the eligibility requirements Walgreens now challenges. The district court didn't explain how the supposed illegality of Virginia's eligibility requirements rendered this misrepresentation immaterial or how it otherwise failed to state a claim.

2.

We're also persuaded that Walgreens can't avoid liability by collaterally challenging the eligibility requirements' legality, under a line of cases beginning with *United States v. Kapp*, 302 U.S. 214, 217–18 (1937) (stating that a defendant can't avoid criminal liability by arguing that a fraudulent statement was about an illegal requirement).

a.

Walgreens says that the governments haven't preserved this argument. But the governments pressed at the motion hearing that Walgreens couldn't "collaterally attack" Virginia's eligibility requirements to avoid liability for fraud. *See* J.A. 777 (district court noting the governments' argument "that this is an impermissible collateral attack on the state regulations").[7]

---

[7] *See also* J.A. 781 (similar); *Walgreen*, 2021 WL 5760307, at *10 (noting the governments' argument that Walgreens is "collaterally attacking" the requirements).

15

While the governments may now be putting a finer point on their argument by expressly invoking *Kapp* and similar cases, the district court and Walgreens were on notice of the contention. *See Wards Corner Beauty Acad. v. Nat'l Accrediting Comm'n of Career Arts & Scis.*, 922 F.3d 568, 578 (4th Cir. 2019) (requiring that "the lower court be fairly put on notice as to the substance of the issue" to preserve an issue for appeal (cleaned up)); *see also In re Under Seal*, 749 F.3d 276, 288 (4th Cir. 2014) (noting that issues are preserved when they're "plainly encompassed by the submissions in the underlying litigation" (cleaned up)).

In any event, we have inherent discretion to consider issues that weren't properly preserved. *Singleton v. Wulff*, 428 U.S. 106, 121 (1976). And we choose to do so here, since (1) we're reviewing de novo whether the complaint states a claim, (2) the *Kapp* question is purely legal, and (3) the parties have fully briefed it.

b.

A long line of Supreme Court cases beginning with *Kapp* establishes that criminal-fraud defendants can't escape liability by arguing that their fraudulent statements went to illegal requirements. *See, e.g.*, *Kapp*, 302 U.S. at 218 ("It is cheating the government at which the [false claims] statute aims and Congress was entitled to protect the government against those who would swindle it regardless of questions of constitutional authority as to the operations that the government is conducting.").[8]

---

[8] *See also United States v. Knox*, 396 U.S. 77, 79 (1969) ("[O]ne who furnishes false information to the Government in feigned compliance with a statutory requirement cannot defend against prosecution for his fraud by challenging the validity of the requirement (Continued)

16

Walgreens says that the *Kapp* precedents don't apply because they're criminal cases. It emphasizes that *Dennis*, for instance, expressly notes the case was "a [criminal] prosecution directed at petitioners' fraud," and "not an action to enforce the statute claimed to be unconstitutional." 384 U.S. at 867. But the governments aren't seeking to enforce Virginia's eligibility requirements. Rather, they seek civil damages caused by Walgreens's factual misrepresentations. Nothing in *Dennis* and its related precedents foreclose their applicability to civil fraud.

In fact, we've already applied *Kapp*'s principles in the civil context. In *Acanfora v. Board of Education*, a teacher deliberately omitted from his job application that he had associated with a gay-rights group. 491 F.2d 498, 501 (4th Cir. 1974). The school district admitted it wouldn't have hired him had the teacher disclosed that association. *Id.* After the teacher publicly supported gay rights, the school district transferred him to a nonteaching position, and the teacher sued, alleging discrimination and a violation of his First Amendment rights. *Id.* at 500–01. The school district refused to reinstate his teaching position, citing the misleading omission on his job application. *Id.* at 500.

The district court dismissed the teacher's case; we affirmed. *Id.* at 499. We clarified that "[t]he principles stated in *Kapp*, *Kay*, *Dennis*, and *Bryson* have not been confined to

---

itself."); *Bryson v. United States*, 396 U.S. 64, 72 (1969) (rejecting the argument that "a citizen has a privilege to answer fraudulently a question that the Government should not have asked"); *Dennis v. United States*, 384 U.S. 855, 865 (1966) ("[P]etitioners are in no position to attack the constitutionality [of a likely-illegal provision requiring them to certify they're not communists]" when their indictment "alleges an effort to circumvent the law and not to challenge it."); *accord Kay v. United States*, 303 U.S. 1, 6 (1938).

17

criminal cases." *Id.* at 502. Applying those principles, we held that the school district could refuse to reinstate the teacher because he "purposely misled the school officials so he could circumvent, not challenge, what he considers to be their unconstitutional employment practices. He cannot now invoke the process of the court to obtain a ruling on an issue that he practiced deception to avoid." *Id.* at 504 (citing *Kay*, 303 U.S. at 6).

Walgreens criticizes *Acanfora* for condoning the school district's "open homophobia." Appellee's Br. at 40. But the shameful and discriminatory stigma that formed the backdrop of that case is beside the point here. *Acanfora* teaches that *Kapp*'s rule applies in the civil context. And if *Kapp*'s principles apply to a discrimination case, it makes even more sense to apply them to claims under the False Claims Act, given that the statute's roots are in the common law of fraud and its civil penalties are meant to be "essentially punitive in nature." *Escobar*, 579 U.S. at 182 (cleaned up).

3.

Finally, Walgreens points to a separate line of cases under *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982), to support its illegality argument. *Kaiser Steel* held that courts can't enforce a promise that violates antitrust and labor laws. *Id.* at 77. Walgreens argues that *Kaiser Steel* prevents the governments from attempting to enforce Virginia's illegal eligibility requirements. But seeking to recover False Claims Act damages for fraud isn't the same as enforcing an illegal requirement.

And *Kaiser Steel* and its ensuing precedents are largely collective-bargaining cases; even at their broadest, they're still limited to contract law. *See id.*; *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 42–45 (1987) (addressing the enforceability of an

18

arbitration award under a collective-bargaining agreement); *Bassidji v. Goe*, 413 F.3d 928, 936–37 (9th Cir. 2005) (applying *Kaiser Steel*'s reasoning to a private contract that would violate an executive order). Walgreens offers no good reason why a contract-law (and even more specifically, a collective-bargaining-contract-law) rule should displace the liability created by the False Claims Act, a federal statute.

At bottom, the governments have the better argument, and Walgreens can't evade liability by collaterally attacking Virginia's eligibility requirements as illegal under the Medicaid Act.

### IV.

One final point. We read the district court's order of dismissal of all the governments' claims—not just those related to the False Claims Act—to be based on materiality. For that reason, our decision today addresses that single legal error at the heart of the district court's dismissal. Having corrected that error, we leave all other issues to the district court.

*VACATED AND REMANDED*

19